(No. 29611.—

The People of the State of Illinois, Defendant in Error, *vs.* Roland Crego, Plaintiff in Error.

*Opinion filed Nov. 20, 1946—Rehearing denied January 20, 1947.*

452

LONDRIGAN & LONDRIGAN, (JOHN R. KOZAK, of counsel,) of Springfield, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and HUBERT H. EDWARDS, State's Attorney, of Pontiac, for the People.

Mr. JUSTICE WILSON delivered the opinion of the court:

The defendant, Roland Crego, was indicted in the circuit court of Livingston county for the involuntary manslaughter of James Eric Sims with a motor vehicle. A jury found defendant guilty. Motions for a new trial and in arrest of judgment were overruled, and he was sentenced to imprisonment in the penitentiary for a minimum term of two years and six months and a maximum of five years. Defendant prosecutes this writ of error for a review of the record.

On Monday, May 21, 1945, Sims, nineteen years of age, started out from his home in the village of Cornell on a borrowed bicycle to visit a young woman who lived four and one-half miles east, and one mile north, of Cornell. The bicycle was not equipped with lights, reflectors or illuminating paint. He arrived at her home about 7:30 P.M., and departed at 11:00 o'clock. Upon the return trip, when about two miles east of Cornell, a 1936 Chevrolet automobile, driven by defendant, struck and killed Sims. His body was found on the north shoulder of the road about

seven feet north of the edge of the concrete slab. The pavement was eighteen feet wide. The bicycle landed on the front end of the car. Defendant's car gradually came to a stop about 900 feet beyond the place of the collision.

Defendant, then twenty-one years old, lives two miles north of Pontiac. He purchased the automobile, a used 1936 gunmetal gray Chevrolet coach on the preceding Saturday, May 19. The headlights on the front end of the car were operated by a control in the dashboard which has three notches. Of these, the first increases the voltage, the second turns on the parking, dash and tail lights, and the third turns on the bright lights. The latter may be deflected to dim by using the foot switch. Tests disclose that the parking lights are plainly visible at a distance of 780 feet. The car was equipped with a radio having an illuminated dial. The radio was in the center of the dashboard. While the radio was being operated the dial was illuminated four or five inches. The next day, Sunday, May 20, accompanied by two friends who live in Pontiac, James Heisner and Andrew Eckel, Jr., sixteen and seventeen years of age, respectively, defendant drove the car to Streator. He encountered some difficulty with the battery, and the car was pushed in order to start the motor. Monday, the battery was charged. At seven o'clock on Monday evening, defendant, Heisner and Eckel started for Streator on State route 23. Streator is twenty-six miles northwest of Pontiac. Cornell is fourteen miles south of Streator, and twelve miles west of Pontiac. About two miles east of Cornell, when traveling west, the occupants of the car saw a young man on a bicycle riding east. Eckel recognized him as Sims. Defendant arrived in Streator about eight o'clock. It was not yet dark, and he had not used the lights on the car. He turned on the lights in Streator after darkness fell, drove the car around the town, using the bright lights. Defendant and the two boys remained in Streator three hours until about eleven o'clock

when they started back to Pontiac on route 23 by way of Cornell. The radio was played continuously upon their departure from Streator. As the car passed through Cornell, Heisner, who was sitting in the middle of the front seat, blew the horn several times. A strong wind was blowing from the south to southwest, the sky was cloudy and black, with moonlight shining through from time to time. The wind interfered with driving to the extent that the car swerved toward the black line in the middle of the road and a foot or two over it. Between 11:30 o'clock and 12:00 o'clock midnight, the accident occurred about two miles east of Cornell and sixteen miles from Streator.

Eckel and Heisner were called as the court's own witnesses. Their testimony was both confused and confusing. Eckel first testified that the car was being operated with bright lights until it was stopped near a place called Ancona corner or Ancona road, about four miles south of Streator, to remove a cigarette which was caught in the door. The lights were switched off at this time. Upon proceeding, as Eckel puts it, "there was a light of some sort on the inside of the car. I couldn't see any in the front of the car." He testified that he did not recall seeing lights on the front of the car after the lights were extinguished; that he did not look at the black line as he could not see it; that he could see the edge of the road; that, after leaving Cornell, the wind caused the car to sway a little from one side of the road to the other, and that he did not know the position of the car with reference to the center of the road when it struck Sims. Eckel testified, further, that he supposed they were driving about fifty miles an hour; that, after leaving Cornell, Heisner and he were operating the radio and not paying any attention to the line in the road; that his impression was that the dash lights were on and, if so, the dim or parking lights were on in the front of the car. He added that he did not see Sims prior to the col-

lision and did not hear defendant say or do anything indicating he saw him.

Heisner testified that, on Monday, after sunset, defendant used bright lights the entire time he drove the car in Streator; that, when they left Streator, the lights were in operation; that these lights were changed but he did not know what occurred; that, in particular, he did not recall whether the car was being operated with lights; that he could not see any lights, but did recollect they were changed at some point between Streator and Cornell; that he did not observe any difference after the lights were changed; that the moon was shining; that he did not know whether the bright lights were on or off; that no light on the front of the car was visible to him, and that he thought the dash lights were on but had no independent recollection of any light other than the radio dial. He added that, after leaving Cornell, they continued at about the same speed, fifty miles per hour; that the car only swayed across the black line in the road when a gust of wind blew on a hill "or something;" that he had no difficulty in seeing the black line; that the lights were of sufficient brightness to see the line easily, and that he did not see anything in front of the car, and that they only passed one car which he saw some distance away. Heisner did not see Sims before the accident, and said that defendant did not say anything leading the witness to believe he saw Sims before the impact of the collision.

Kenneth Ferguson, fifteen years of age, together with his brother, Raymond, left the home, in Cornell, of the boy from whom Sims borrowed the bicycle about eleven o'clock in the evening of May 21. He testified that they saw Sims walking on the shoulder on the north side of the road pushing his bicycle going west. On cross-examination, he testified that the night was windy; that Sims was not on the pavement, and that he, the witness, did not know why he was pushing the bicycle. Raymond Ferguson placed the

point where he and his brother saw Sims at about one and one-third miles east of Cornell. He said that they blew the horn on their car and that Sims waved to them in recognition. He stated that the only reason suggesting itself for Sims walking instead of riding was the fact the wind was very strong. William Roberts, who also saw Sims pushing his bicycle on the north side of the road, observed that a very strong westerly wind was blowing.

Dorothy Shobe and her husband, Robert, the minister of the Baptist church in Cornell, live on the east side of Cornell. The former testified that, about 11:30 P.M. on May 21, she heard an automobile horn blowing continuously as a car passed her home. Her husband knew Sims, and picked him up earlier in the evening at Streator. Later, about 6:45 P.M. he saw Sims riding a bicycle east of Cornell and told him to hurry and be careful. He testified that his wife directed his attention to the horn, and that he look out the window but saw only a blur of darkness in the shape of an automobile going east without lights.

Defendant testified that when he left Streator his bright lights were in operation, and that, afterwards, the lights were changed from dim to parking lights until the time of the accident, except that, when going around curves, the bright lights were used. He added that, upon leaving Streator, he changed the lights somewhere along the road; that he did not recall when he made the change from bright to parking lights, and did not know the reason for making the change. According to defendant, there was no other occasion, between the time he parked the car on the right shoulder of the road, the west side, to remove the cigarette, and the time of the collision, when the lights were turned off. Defendant stated that the fact he had encountered trouble with his battery the preceding day did not influence him in the manner in which he used the lights on May 21. He declared that he was driving the car at the time of the accident between forty and fifty miles per hour,

more. likely about forty-five miles per hour, but did not look at the speedometer. Referring to the heavy wind, defendant stated that he could see the black line but, when a gust of wind came, he would go over the line a little and would then bring the car back. After leaving Streator, several cars passed him but he did not remember any car passing during the time the car was stopped for the purpose of removing the cigarette, nor within the next three miles. Defendant declared that he did not see Sims before hitting him.

Lloyd and Lyle Miner, Keith Wayman and Leona Allen were permitted to testify in rebuttal upon the theory that the credibility of the testimony of the defendant, and, specifically, the testimony that a tail light on his car was lighted, was subject to rebuttal. Over defendant's objections, Miner testified that, at the Ancona corner, a car was parked on the right-hand side of the road on the shoulder of the highway, two boys were standing to the right of the car, and the lights were not in operation. He added that, shortly thereafter, this same car passed him on the road without lights at a "good" rate of speed; that the wind was blowing; that he did not know whether the car was on its side of the black line, and that he could not distinguish its number. Lyle Miner's testimony is to the same effect.

Keith Wayman testified that, after eleven o'clock in the evening of May 21, he and Leona Allen were sitting in an automobile in front of her house on the south side of route 23 facing east, and that he observed a car traveling east at a high rate of speed, with its horn blowing, and that he did not observe "any burning lights of any kind." Leona Allen testified that the attention of Wayman and herself was attracted by the horn on an automobile which had no tail light.

The single contention requiring consideration is whether the evidence establishes defendant's guilt beyond a reason-

able doubt. The gist of the offense of involuntary manslaughter with a motor vehicle is criminal negligence. (*People* v. *Herkless*, 361 Ill. 32.) Negligence, to become criminal, must be reckless or wanton and of such a character as to show an utter disregard for the safety of others under circumstances likely to cause injury. (*People* v. *Lynn*, 385 Ill. 165; *People* v. *Allen*, 368 Ill. 368; *People* v. *Sikes*, 328 Ill. 64; *People* v. *Anderson*, 310 Ill. 389.) A duty devolves upon every person who drives upon a public highway to observe, in the control and management of his vehicle, the exercise of reasonable care to prevent injury to others. (*People* v. *Schneider*, 360 Ill. 43; *People* v. *Schwartz*, 298 Ill. 218; *People* v. *Adams*, 289 Ill. 339; *People* v. *Falkovitch*, 280 Ill. 321.) On the other hand, criminal liability does not attach to every act of negligence resulting in injury, or even death, to another person, but only to negligence of such a reckless or wanton character as to show an utter disregard for the safety of others under circumstances likely to cause an injury. (*People* v. *Lynn*, 385 Ill. 165; *People* v. *Burgard*, 377 Ill. 322; *People* v. *Schneider*, 360 Ill. 43.) Negligent acts are not always synonymous with an exhibition of wilful and wanton disregard of the safety of others. (*People* v. *Schneider*, 360 Ill. 43; *People* v. *Anderson*, 310 Ill. 389; *People* v. *Adams*, 289 Ill. 339.) Again, where acts or circumstances are attributable to either an innocent or a criminal cause, the innocent hypothesis will be adopted. (*People* v. *Lynn*, 385 Ill. 165; *People* v. *Burgard*, 377 Ill. 322.) In short, defendant's conviction cannot be sustained in the absence of proof of criminal negligence.

The evidence discloses that the automobile driven by defendant struck and fatally injured Sims, on a State highway, a country road, between two and three miles east of Cornell, sometime between 11:30 and midnight on May 21, 1945. An unusually heavy wind was blowing,—so strong from the southwest, at the time of the collision, that

gusts of wind caused defendant's car to go over the black line at the center of the road a foot or two. At least one other car proceeding over this same route encountered the same difficulty with the strong wind. Testimony that defendant's car was more than two feet over the center line of the thoroughfare at any time is wanting. Less than thirty minutes before the accident, Sims was observed approaching Cornell, walking west on the shoulder on the north side of the road pushing the bicycle. So far as the record discloses, the only reason for him not riding the bicycle was the high wind. Admittedly, the bicycle was not equipped with lights, reflectors or illuminating paint. Had he been pushing the bicycle on the shoulder when defendant's automobile approached, the collision could not have occurred. The evidence does not admit of the conclusion that Sims was walking beside the bicycle at the time of the accident. He must, therefore, have been riding the bicycle, without lights, on a country road in the middle of the night and at a time when an exceptionally strong wind was rendering the driving of automobiles on the other side of the highway extremely difficult. Defendant's car was being driven about forty-five miles per hour when it struck Sims. Defendant's testimony, supported by his young companions, is that he saw neither the bicycle nor Sims at the instant of, or immediately preceding, the collision. Moreover, there is nothing in the manner in which the car was driven nor in his own conduct tending to indicate that he saw the bicycle.

Defendant testified that at the time of, and immediately prior to, the accident, he was driving the automobile with parking lights which tests show were readily visible at a distance of 780 feet. The testimony of the only occurrence witnesses, the two boys, Eckel and Heisner, was confused with respect to the question whether the car was being driven with or without lights. They did testify, however, that a light of some kind was in operation on the inside of the car, and that they could see the road without difficulty.

A close examination of Eckel's testimony discloses he testified that the dash lights were in operation and, if so, the parking lights were in operation. The testimony of Lloyd and Lyle Miner does not aid the prosecution. A concession that they saw an unidentified car without lights pass their automobile is not adequate proof that it was defendant's automobile. The same observation applies to the testimony of Wayman and Leona Allen. They identified neither the automobile nor its occupants. Again, one of defendant's companions was blowing the horn on the automobile as they passed through Cornell. Proof that the automobile which Robert and Dorothy Shobe saw was defendant's car and that the persons riding in the car were himself and his companions is not convincing.

The evidence adduced with respect to the use of lights is largely circumstantial. The fact that an automobile without lights was driven through Cornell shortly before the accident and the additional fact that a boy and a girl seated in a car by the side of the road saw a car pass them without lights is far from satisfactory proof that the car, in either instance, was the automobile driven by defendant. Direct evidence, of course, is not required to establish the perpetration of a crime. It is equally well settled, however, that, to warrant a conviction on circumstantial evidence, the facts and circumstances proved must be sufficient to establish the guilt of the person accused to a moral certainty and to the exclusion of every other reasonable hypothesis. (*People* v. *Burgard,* 377 Ill. 322; *People* v. *Christocakos,* 357 Ill. 599.) A judgment of conviction resting largely upon circumstantial evidence and leaving serious doubt that the defendant was criminally negligent cannot stand. (*People* v. *Burgard,* 377 Ill. 322.) A concession that defendant was guilty of negligence in the operation of his car at the time and place of the accident does not lead, necessarily, to the conclusion he was guilty of wilful and wanton negligence. The rate of speed of the

car at the time of the accident, the condition of the lights, and the physical condition of the driver are factors bearing upon the question of the character of defendant's negligence. Defendant was driving on an open country highway, but little traveled, in the middle of the night when he struck a bicycle, not equipped with warning lights or reflectors of any kind, and fatally injured the boy riding the bicycle. Considering the character of the highway, the time of the night, evidence that defendant was proceeding at a dangerous rate of speed is lacking. A careful examination of all the testimony fails to disclose positive evidence that the car was being operated without lights at the time of the collision. The unsatisfactory testimony of Eckel and Heisner is insufficient to support the People's repeated assertion that the lights were not functioning when the car struck Sims. There is no evidence, or even a suggestion, that defendant, Heisner or Eckel were intoxicated. Defendant and his companions did not see the bicycle or Sims at the time of, or immediately preceding, the collision for the reason that there were no lights or reflectors on the bicycle. Admittedly, defendant was required to look out for pedestrians on the highway. A prudent person, in the exercise of ordinary care and caution, would not, however, expect to meet a bicycle near the middle of a country road at midnight, particularly a bicycle without lights or reflectors. In the absence of proof that defendant had notice of or reasonable opportunity to know that he would encounter a bicycle, without a light or reflector, at midnight near the middle of a lightly traveled country road, it cannot be said that he was guilty of criminal negligence. Indeed, one would hardly expect to meet a bicycle with lights on the road at this late hour.

Before a verdict of guilty in an automobile manslaughter case can be sustained the proof must disclose that defendant knew of the danger of collision and recklessly, negligently or wantonly ran down and collided with the deceased

without using such means as were reasonable and at his command to prevent the accident. (*People* v. *Sikes,* 328 Ill. 64; *People* v. *Schwartz,* 298 Ill. 218; *People* v. *Falkovitch,* 280 Ill. 321.) Again, it has been said that whether a person whose conduct has occasioned the death of another is criminally responsible depends upon the proof tending to show knowledge, or absence of knowledge, as to the consequences of his act or omission. (26 Am. Jur. Homicide, sec. 206.) Here, the evidence failed to show even knowledge of a probable source of danger. For the judgment rendered on the verdict to stand, the record must disclose beyond a reasonable doubt not only that defendant was driving his automobile in a reckless and wanton manner but, also, that his reckless and wanton conduct was a proximate cause of the accident resulting in the death of Sims. (*People* v. *Lynn,* 385 Ill. 165; *People* v. *Burgard,* 377 Ill. 322.) Manifestly, no legal duty rests upon the driver of an automobile to anticipate so remote a possibility as meeting a bicycle without lights under the conditions present in this case. The use of parking lights instead of bright driving lights may well have constituted negligence on the part of defendant but not, necessarily, criminal negligence. Our attention is directed to the fact that the law does not require lights on a bicycle. Irrespective of whether there was a violation of the law, this fact cannot avail the prosecution since riding on a bicycle without lights in the middle of the night is conduct of a character not likely to be anticipated. Nor does the fact that defendant met Sims at about the same place four or five hours earlier when riding a bicycle in any way support a conviction dependent upon criminal negligence. When defendant saw Sims the first time, the latter was riding his bicycle in broad daylight. It does not follow that because the driver of an automobile should anticipate meeting bicycles on the road in the daytime, or before darkness falls,

he should, also, anticipate meeting bicycles without lights many hours later in the darkness of midnight.

A consideration of all the facts and circumstances impels the conclusion that the evidence is not sufficient to remove all reasonable doubt of defendant's guilt of involuntary manslaughter. This being so, no useful purpose can be served by remanding the cause for a new trial.

The judgment of the circuit court of Livingston county is reversed.

*Judgment reversed.*