THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ ANTONIO ROMÁN SEDA, Defendant and Appellant.

No. 11,631. Argued November 8, 1946.—Decided February 6, 1947.

*Mariano Acosta Velarde, Daniel Pellón Lafuente,* and *Fernando Fornaris, Jr.,* for appellant. *Luis Negrón Fernández, Acting Attorney General,* and *Joaquín Correa Suárez, Assistant Prosecuting Attorney,* for appellee.

Mr. Justice De Jesús delivered the opinion of the court.

Appellant was convicted by a jury of a violation of § 328 of the Penal Code of Puerto Rico (felony) and sentenced to serve three years' imprisonment in the penitentiary. He assigns several errors, the first of which refers to the insufficiency of the information. The defect pointed out in the latter consists in that it fails to follow the terms of the statute, and the language used therein does not charge the gross negligence contemplated by § 328 of the Penal Code.[1] We shall turn to the pertinent part of the information:

". . . while [the defendant] was operating the train as conductor in charge of the movements and direction of the engine to which mail train No. 3 was coupled . . . en route . . . from Isabela to Aguadilla, he unlawfully and willfully, recklessly and without due care and circumspection, upon reaching the grade at a place known as "Cuesta Vieja" with which he was familiar . . . failed to slow down, as he should have done, on approaching said grade *at an excessive rate of speed, refusing to slow down and with wanton negligence and carelessness he operated* the engine together with the train it pulled, at an extraordinary speed along said grade *regardless of the curves and slopes,* and without taking due precaution to insure the safety of lives and property, causing said machine, when coming

---

[1] Section 328 of the Penal Code, in its pertinent part, provides:

"Every conductor, engineer, . . . or other person having charge wholly or in part of any railroad car, . . . automobile . . ., who, through gross negligence or carelessness, suffers or causes the same to collide with another car, locomotive, . . . or with any other object or thing whereby the death of a human being is produced, is punishable by imprisonment in the penitentiary for a maximum term of five years.

"If as a consequence of the collision, injury is suffered by any person, such conductor . . . shall be punishable by imprisonment in jail for a maximum term of two years, or by a maximum fine of one thousand dollars, or by both penalties in the discretion of the court."

862

out of a curve and approaching a reverse curve, to run off the track, colliding against a wall, a tree and a house, as a result of which collision it caused the death of . . . who were travelling in the train." (Italics ours.)

It should be noticed that the complaint charged the defendant with going at an excessive speed upon entering the slope, with which he was acquainted, refusing to slow down, and that he acted with gross negligence in running the engine downhill at an excessive speed regardless of the curves and steepness of the grade. In our opinion, the information did not only charge the defendant with having acted with wanton negligence and recklessness, but it also set forth the facts constituting negligence.

Appellant argues that there is no law in Puerto Rico which fixes the maximum speed at which trains may be run in a rural zone. It is true that there is no such statute, but the safety of the passengers and the duty to cause no harm to others through carelessness or negligence, require that any person operating a train should slow down to the extent that the circumstances demand. As stated in *People* v. *Rodríguez*, 47 P.R.R. 565:

". . . the absence of a statute setting a limit to the speed of trains in the open country when approaching a crossing does not warrant. when speeding up, the negligent and careless driving, disregarding the life and safety of the persons . . . , where it is advisable by circumstances to slow down."

A rate of speed that may be considered prudent and safe while the train is running along a safe stretch of road may become reckless and excessive when the train, with passenger and freight cars, goes down "Cuesta Vieja" in Aguadilla, where the grade is steep and there are several double curves.

Since the information is sufficient, we shall turn to the second error assigned to wit, that the verdict is contrary to the evidence.

*Eleuterio Rodríguez*, witness for the prosecution, testified that the defendant is an experienced engineer, who was ac-

quainted with "Cuesta Vieja" of Aguadilla, that on the day of the accident train No. 3 was going from San Juan to Ponce, and that the witness was the engineer; that upon reaching the Cortés siding, between Isabela and Aguadilla, the defendant took charge of the engine, which was there in perfect condition. On cross examination, the witness admitted that locomotives that have been in good condition may suddenly run out of order, especially the brakes. He further testified that once the air pump is out of order, any effort on the part of the engineer to control the speed of the engine is useless because the latter is pulling a train which pushes it and constantly increases its speed. He stated that once, while the witness was operating a train down "Cuesta Vieja" of Aguadilla, the air pump suddenly failed to work and he was unable to stop the train until it reached Central Coloso. Referring to the case at bar, he stated that if on leaving the Jiménez siding, the air pump goes out of order, the speed may be slightly reduced, but if the train is already going down grade it is very hard to control it.

*José Alfonso Hernández,* another witness for the prosecution, testified that he had been a train conductor, that he had taken the train as a passenger in Camuy between one and one thirty in the morning; that the train had been running all the time at a regular speed; that at the Cortés siding there was a train crossing and on leaving said siding, train No. 3 "was going a little faster because undoubtedly there is a straight stretch of road with no declivities"; that after passing the Cortés siding it stopped at the Maleza siding and thereafter it continued and stopped at the Jiménez siding, continuing from there to Aguadilla; that a little after leaving the Jiménez siding it began to run down a grade which is quite dangerous and steepy, about three or four kilometers long, until it reached the Aguadilla station; that where the descent starts, there is a long stretch of road followed by several curves and straight tracks; that when it started to descend he noticed that the train had taken on

speed and upon reaching the place of collision it was running at an excessive rate of speed; that when it approached the grade crossing he heard no whistle or alarm signal; that he did not hear the brakes applied; that when brakes are put on there is an escape of air and that, if the air fails, the brakes make no noise.

Policeman *Francisco Figueroa Ramírez,* a witness for the prosecution, testified that he took the train at Buchanan in order to go to Yauco; that when the train left Camp Buchanan it was running at a moderate speed until it reached "Cuesta Vieja" of Aguadilla; and that thereafter he noticed that it was running at an excessive speed.

*Susano González,* Insular Police Detective, testified as witness for the prosecution, describing the topography of the land along the road of "Cuesta Vieja" of Aguadilla. He was not travelling on train No. 3 that night, but upon being examined by the district attorney, he testified that when the air brakes are put on the noise of the air displacement and of the brakes is heard while the cars come to a stop.

Felipe Morales, as witness for the prosecution, testified that he was acting as gateman at the grade crossing where the derailment took place; that on that night he did not hear the train whistle upon reaching the grade crossing, but he saw the lights of the engine and rushed to place the chains; that he placed one, but could not cross the tracks to place the other because the train was running at such speed that he realized that he would not reach in time.

The evidence for The People also reveals that when the train reached the grade crossing at Aguadilla one of the cars and the engine ran off the track, colliding against a tree, a house, and a wall which extended all the length of the tracks. Furthermore, when the trial began, the defendant admitted that he was the engineer of train No. 3 which ran off the track, and that by reason of that derailment the persons enumerated in the information were killed.

That was, in brief, the evidence presented by the district attorney. What this evidence tends to show is that at "Cuesta Vieja" of Aguadilla, the train was coming at an excessive rate of speed and, as a result of this, one or two cars ran off the tracks colliding with a tree, a house, and stonewall along the length of the tracks. No explanation whatsoever emerges from this evidence as to the alleged negligence of the defendant. On the contrary, all the witnesses, except José Alfonso Hernández, testified that up to the time the train began to go down grade, it was running at a moderate rate of speed. Only José Alfonso Hernández testified that upon leaving the Cortés siding (it should be noticed that it made a stop afterwards at the Maleza siding and another at the Jiménez siding) it was running a little faster, but he immediately explained this statement by saying "because undoubtedly there is a straight piece of tracks with no declivities."

There is no evidence whatsoever showing that when defendant operated the train his faculties were in any way restrained by the effect of alcohol or by any other cause. Furthermore, there is a fact which most probably was not taken into account by the jury, and that is that the defendant was operating a train subject to schedule and it does not appear that he was behind time. What interest could defendant have in running the train at a greater speed at a place of danger or even in peril of his own life and of the passengers if later he had to stop at Aguadilla and wait for the time scheduled to leave?

The wilful negligence or recklessness contemplated by § 328 of the Penal Code does not mean a mere lack of care, but a degree of negligence or carelessness greater than that required to obtain damages in a civil action. *People* v. *Rodríguez*, supra. And in *People* v. *Adams*, 124 N. E. 575 (Ill. 1919), cited with approval in *People* v. *Rodríguez, supra,* the Supreme Court of Illinois said:

". . . Gross negligence is negligence that borders on recklessness, and wanton negligence, as applied to the running of motors and vehicles, implies a positive disregard of the rules of diligence and a reckless heedlessness of consequences, according to Babbit in his work on Motor Vehicles, section 1517. Ordinary negligence merely denotes a negative quality in a person in attending or discharging a duty. Criminal liability cannot be predicated upon every lawful act carelessly performed, merely because such carelessness results in the death of some one. Negligence, to become criminal, must necessarily be reckless or wanton and of such a character as shows an utter disregard of the safety of others under circumstances likely to cause injury. *People* v. *Falkovitch*, 280 Ill. 321, 117 N. E. 398, Am. Cas. 1918 B, 1077."

See also *People* v. *Burgard*, 36 N. E. (2d) 558 (Ill. 1941) and the annotations in 161 A.L.R. 63.

Let us now turn to the explanation given by defendant. He testified that when he began to descend, he put on the air brakes but they failed to work and that he did everything in his power to stop the train but that all his efforts proved useless; that upon reaching the grade crossing at Aguadilla he noticed that one of the passenger cars jolted and he heard the noise as it ran off the track and immediately afterwards the engine was derailed too, that he does not remember what happened afterwards because he was seriously injured.

The testimony of the defendant was not contradicted, for, although some of the witnesses for the prosecution testified that they did not hear when the brakes were put on, the evidence for the prosecution shows that when the air pump goes out of order, the brakes when put on make no noise.

In our opinion, the evidence is insufficient to sustain a verdict of guilty in the present case. For the reasons stated, the judgment is therefore reversed and the defendant discharged.

Mr. Justice Snyder did not participate herein.